COHEN & WILLWERTH, P.C.
PAUL JAY COHEN, ESQUIRE          Attorneys for Plaintiff
Identification No. 38441
LAWRENCE FISHER, ESQUIRE
Identification No. 67667
660 Second Street Pike
Southampton, PA 18966
(215) 887-8100

| | |
|---|---|
| ALWAYS IN SERVICE, INC. | : UNITED STATES DISTRICT COURT<br>: EASTERN DISTRICT OF<br>: PENNSYLVANIA<br>:<br>:|
| Plaintiff | : **JURY TRIAL DEMANDED**<br>:|
| v. | :|
| SUPERMEDIA SERVICES – EAST, INC.,<br>f/k/a IDEARC MEDIA SERVICES – EAST, INC.;<br>and SUPERMEDIA LLC, t/a SUPERMEDIA<br>f/k/a IDEARC MEDIA LLC; and,<br>SUPERMEDIA INC., f/k/a IDEARC INC., | :<br>:<br>:<br>:<br>: NO._____ |
| Defendants | |

## CIVIL ACTION COMPLAINT

Plaintiff, Always in Service, Inc., by and through their Attorneys, Paul Jay Cohen, Esquire and Lawrence H. Fisher, Esquire, hereby files this Complaint and in support thereof avers as follows:

### Parties

1.  Plaintiff, Always in Service, Inc. ("AIS") is a Pennsylvania corporation with a registered business address of 1713 Old York Road, Abington, PA 19001.

2.  Defendant, SuperMedia Services – East Inc., f/k/a Idearc Media Services – East Inc., is a Delaware corporation registered as a foreign business in Pennsylvania and doing business in Montgomery County Pennsylvania (hereinafter referenced collectively and

individually with all other Defendants as "SuperMedia").

3. SuperMedia LLC, t/a SuperMedia, f/k/a Idearc Media LLC, is a Delaware corporation registered as a foreign business in Pennsylvania and doing business in Montgomery County Pennsylvania (hereinafter referenced collectively and individually with all other Defendants as "SuperMedia").

4. SuperMedia Inc., f/k/a Idearc Inc, is a Delaware corporation registered as a foreign business in Pennsylvania and doing business in Montgomery County Pennsylvania (hereinafter referenced collectively and individually with all other Defendants as "SuperMedia").

### Jurisdiction and Venue

5. Jurisdiction is vested in the United States District Court for the Eastern District of Pennsylvania by virtue of diversity jurisdiction, pursuant to 28 U.S.C. § 1332, as Plaintiff seeks damages in excess of $75,000.00 and Plaintiff is a citizen of Pennsylvania whereas all Defendants are Delaware corporations. Venue is appropriate as all matters complained about pertain to occurrences in this Judicial District, specifically, Montgomery County Pennsylvania. 28 U.S.C. § 1391(a)(2).

### Allegations

6. All of the acts and omissions complained about herein were undertaken by SuperMedia through its authorized representatives, within the scope of their responsibilities and employment, who possessed full authority to act on behalf of SuperMedia, and who were acting with express and implied corporate approval and consent.

7. AIS, formerly known as A1 Best Locksmith, was started in 2007 by three honest and experienced individuals who worked around the clock to build the business into a multi-million dollar company.

8. They hired good, hard-working employees that they trained in their own facility to do their work competently and professionally while always making customer service and satisfaction a top priority.

9. The company was founded on the principles of integrity, hard work and customer satisfaction. Having a good reputation was always the number one goal.

10. AIS uses all the latest advances and has developed its own technology and system to run its business efficiently.

11. It is, however, heavily dependent on advertising, which, if done improperly by the wrong company, could ruin AIS.

12. For purposes of advertising, AIS was contacted by a representative of SuperMedia.

13. AIS and SuperMedia contracted for advertising services and sales representative Joseph Albert placed AIS in a "high-risk" heading in this regard.

14. Initially, the terms of this "high-risk" advertising between AIS and SuperMedia required AIS to pay thousands of dollars of yearly advertising cost up front.

15. At the time AIS began advertising through SuperMedia, this yearly advertising cost represented the entirety of capital that AIS possessed as a start-up company.

16. In an effort to make a "quick sale" with AIS, Mr. Albert scribbled the advertising artwork onto a copy sheet for AIS to sign.

17. Being novices and not knowing any better, AIS signed the copy sheet.

18. What AIS was not told is that by doing this, they were not given a chance to sign off on the final artwork. This resulted in misinformation in the ad and ended up costing AIS hundreds of thousands of dollars in lost revenue and profits.

19. From there, the problems with SuperMedia started to multiply. For example, SuperMedia allowed other companies to do what is called "heading jumping."

20. At the time, AIS was not familiar with the term and never knew about this type of fraudulent practice. Whereas AIS spent thousands of dollars a month and was promised a prominent position in the book, SuperMedia allowed others to jump headings – i.e. place an ad under "*Lockers,*" which alphabetically comes before "*Locks*," – depriving AIS of their prominent position that they were promised and paid for.

21. Other problems AIS experienced with SuperMedia include, but are not limited to:

   a. SuperMedia initially offered AIS lower advertising prices as a whole if it advertised in more directories, which AIS did, and thereafter tripled the price for AIS to advertise through SuperMedia. After AIS invested in the expected growth of its business from its initial advertising through SuperMedia – acquiring new equipment, a new phone system, new computers, new software, additional internet connectivity, new tools and materials, and additional staff, including dispatchers, technicians, an office manager, an inventory manager and a bookkeeper – it was forced out of additional markets when SuperMedia nearly tripled the advertising costs, and is now left with all of these additional long-term costs;

   b. Representatives of SuperMedia printed ads without approval;

   c. SuperMedia offered advertising prices and then reneged on the deal after receiving a huge down payment;

   d. SuperMedia Delivered fewer books in a geographic area than promised;

   e. SuperMedia Delivered books late to customers;

  f. SuperMedia placed incorrect information in AIS ads;

  g. SuperMedia failed to take out the BBB logo from AIS ads;

  h. SuperMedia failed to give AIS free direct mail as promised; and,

  i. SuperMedia intentionally helped AIS' competitors.

22. Additionally, SuperMedia engaged in "Scamology," whereby salespeople manipulated the SuperMedia "Identity Bundles" and engaged in false guarantees and empty promises for products that did not work and trained employees to scare customers about losing their business if they did not spend money on advertising that ultimately failed to yield any results.

23. Also, SuperMedia wrote up "high risk" accounts in "non-high risk" headings. In this regard they guaranteed leads each month. AIS signed up and never received leads.

24. SuperMedia rolled out products and pitched them as the best thing ever, but then brought out another version of the product soon thereafter and went back to AIS telling them it costs more but "it's the best thing ever."

25. Moreover, sales representatives at SuperMedia were trained to be deceptive in an effort to achieve the highest sales possible. For example, they were trained to advise AIS to purchase local indigenous phone numbers with local area codes and prefixes and to advertise these phone numbers in the book. This was done to make AIS appear local to the consumer using the directory. They were also told to make sure that the headlines of the ad also gives the impression that AIS is a local company. Additionally, the sales representatives were trained to add logos and accreditations to the ad without verifying whether or not AIS actually had the accreditation or approved of the logo.

26. Accordingly, AIS purchased hundreds of remote call forwarding numbers. Next,

SuperMedia's in-house graphic designers made AIS look like a local company in the advertisement. This included using many different "local" names. Finally, SuperMedia, on its own, placed the BBB logo in AIS' ads.

27. In doing all of the above, AIS relied exclusively on the advice and representations of SuperMedia that what it was doing was legal and correct.

28. By contrast, SuperMedia knew that the practices above were improper and even engaged in such practices itself, particularly by trading under so many different names.

29. On October 14, 2010, AIS was sued by the Commonwealth of Pennsylvania Office of the Attorney General. In that Complaint, the Attorney General is alleging that the practices, which SuperMedia implemented on behalf of AIS, are a violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law.

30. Therefore, as a result of SuperMedia's implemented these practices by AIS and the design and placement of the ads, AIS is now being sued by the Attorney General's office.

31. In addition to the above, AIS was told that SuperMedia would not allow the advertisement that AIS wanted unless they purchased $15,000 per month of online "pay-per-click" advertising through SuperMedia's search engine marketing. Because AIS was now dependent on the other advertisement, it was "forced" to purchase the pay-per-click advertising, even though it did not want it. After doing so, AIS learned that this was another deceptive and fraudulent scheme run by SuperMedia.

32. SuperMedia provided no documentation or proof provided to justify the costs being charged to AIS for advertising. Although SuperMedia promised that AIS would be able to review the IP addresses of their pay-per-clicks, the information was never provided.

33. SuperMedia also failed to provide customer support as SuperMedia continued to

deceive their customers by placing improper keywords and expanding the customers' geographic area to fraudulently get more clicks.

34. After two months of this, AIS cancelled the monthly budget but was forced to continue to pay the $2,000 per month management fee. This ended up being a $2,000 per month penalty for something AIS did not want in the first place and was forced to purchase.

35. Furthermore, SuperMedia recently nearly tripled the costs being charged to AIS by SuperMedia. This will essentially put AIS out of business.

36. Additionally, much of the SuperMedia's advertising on behalf of AIS contained mistakes, or there were discrepancies between what AIS paid for in the way of advertising versus what SuperMedia provided, such that AIS was entitled to credits from SuperMedia which SuperMedia failed to provide.

37. To make matters worse, this is being done at a time when AIS is looking to sell its business for millions of dollars.

38. As a result of the actions by SuperMedia, AIS has lost all of its potential buyers, costing it millions of dollars in lost profits.

## COUNT I

### Plaintiff vs. SuperMedia Services – East Inc., f/k/a Idearc Media Services – East Inc.; SuperMedia LLC, t/a SuperMedia, f/k/a Idearc Media LLC; and, SuperMedia Inc., f/k/a Idearc Inc.,

### BREACH OF CONTRACT

39. AIS incorporates by reference all of the above stated paragraphs as if the same were set forth at length herein.

40. AIS and SuperMedia entered into various contracts as set forth above and

supported by adequate consideration.

41. Although these contractual transactions between AIS and SuperMedia were memorialized in the form of: written contracts entered into between AIS and SuperMedia (and their respective predecessors), as well as by artwork, proofs, invoices, advertisement books, emails and notes, SuperMedia possesses these materials and refuses to provide them to AIS such that AIS is excused from attaching them to this Complaint. Nevertheless, an agreement representative of the various agreements entered into between the parties is attached hereto and incorporated herein as "Exhibit A."

42. As stated heretofore, SuperMedia failed in its obligations under these contracts, never intended to fulfill its obligations under these contracts, and deprived AIS of the benefits bargained for in these contracts.

43. SuperMedia was duty-bound to provide AIS with the promised benefits in these contracts.

44. SuperMedia breached said contracts as alleged herein.

45. As a result of said breach committed by SuperMedia, AIS has been injured as alleged herein.

**WHEREFORE**, AIS respectfully requests this Honorable Court enter a Judgment in its favor and against the SuperMedia for monetary damages in the amount in excess of $150,000.00, interest, costs of this action, and any other remedy this Court deems appropriate.

## COUNT II

### Plaintiff vs. SuperMedia Services – East Inc., f/k/a Idearc Media Services – East Inc.; SuperMedia LLC, t/a SuperMedia, f/k/a Idearc Media LLC; and, SuperMedia Inc., f/k/a Idearc Inc.,

## FRAUD, DECEIT AND MISREPRESENTAION

46. AIS incorporates by reference all of the above stated paragraphs as if fully stated herein.

47. SuperMedia's acts as alleged above constitute fraud, deceit and misrepresentation.

48. This fraud, deceit and misrepresentation was material to the contractual transactions at issue.

49. SuperMedia knew that these representations were false or recklessly disregarded whether these representations were true or false.

50. SuperMedia intended to induce AIS into the contractual transactions at issue through the use of these false representations.

51. AIS justifiably relied on SuperMedia's false representations in entering into the contractual transactions at issue.

52. AIS was damaged as alleged as a proximate cause of the fraudulent misrepresentations as alleged herein.

53. The acts and omissions of SuperMedia in this regard are wanton and egregious entitling AIS to an award of punitive damages.

WHEREFORE, AIS respectfully requests that this Honorable Court enter judgment against SuperMedia and in favor of AIS, in the amount in excess of the $150,000.00, plus interest, costs, punitive damages and all other relief deemed just and appropriate.

## JURY TRIAL DEMANDED

AIS hereby respectfully requests a trial by jury on all counts of this Complaint.

Respectfully submitted,

COHEN & WILLWERTH, P.C.

BY: _____
LAWRENCE H. FISHER, ESQUIRE
PAUL JAY COHEN, ESQUIRE
Counsel for Plaintiff
660 Second Street Pike
Southampton, PA 18966
Tel: (215) 887-8100
Fax: (215) 887-8732

DATED: January 6, 2011

# EXHIBIT A



**ADVERTISING AGREEMENT**
Terms and Conditions

*Received Time Dec. 23. 2010 10:42AM No. 3990* *(rotated, faint)*

"You" means the individual or business entity listed above. "We," "us" and "our" means SuperMedia LLC. "Print Ads" means advertising in our print directories or other printed non-directory products (together, "Publications"). "Electronic Ads" means advertising on various electronic media, including the Superpages.com® service, consisting of websites we own and third party websites, wireless platforms, and other applications for which we have agreements from time to time (collectively our "Electronic Platform"). "Ad" or "Ads" means Print Ads and/or Electronic Ads. You agree that this Advertising Agreement and any additional terms and conditions ("Additional Terms") that we publish on the websites described in the next sentence and that are in effect on the Agreement Date or that are included in any pre-printed addenda we provide (together, the "Agreement") apply to the Ads and services ("Services") listed in the order section above. These terms and conditions also are available at www.superpages.com/terms and at www.supermedia.com/help/terms-conditions.jsp. You are responsible for reviewing these terms and conditions and the Additional Terms.

1. **Order.** By signing below or by Recorded Oral Agreement (herein so called), you authorize us to publish the Ads listed in this Agreement in the applicable Publications and/or Electronic Platform, and to provide the Services listed in this Agreement. You also authorize us to act as your agent to request from your local telephone carrier any listing changes that you provide to us. The "Agreement Date" is the date you sign this Agreement or orally consent to this Agreement.

2. **Notices/How to Contact Us.** All notices to us must be in writing and mailed to SuperMedia LLC, P.O. Box 610609, D/FW Airport, TX 75261, faxed to 972-453-6784, or sent by going to www.supermedia.com/support/contact-us, clicking on "Client service contacts," and completing the information requested to send an email. Cancellation notices must include your business name, telephone number, and address. For questions about this Agreement or your advertising, please call Client Care at 800-555-4833.

3. **Term.** Subject to automatic renewal as described in Section 4 and unless otherwise provided in the Additional Terms, (i) the initial term for a print Ad or Service is the period we provide such Ad or Service and (ii) the initial term for Electronic Ads and electronic Services is 12 months or such other period as is set forth in the order section of this Agreement.

4. **Revision/Cancellation/Automatic Renewal.** You may revise or cancel your request for Ads and Services only by written notice that is received by us (i) for Ads and Services in Publications (except for limited inventory items), by the later of the close date or three business days after the Agreement Date, (ii) for limited inventory items in Publications, within three business days after the Agreement Date; and (iii) for Electronic Ads and electronic Services, within 21 days after the Agreement Date. We will attempt to contact you regarding the renewal of your directory Ads. If we send a renewal notice to you at the address reflected in our records regarding your print directory Ads for the next issue of a print directory and we do not receive a written cancellation notice from you by the close date, we may automatically renew your print directory Ads, except for limited inventory items (Section 17), in the next subsequent issue. You are responsible for obtaining a Publication close date by calling Client Care at 800-555-4833. We may automatically renew your Electronic Ads and electronic Services after the end of the initial term for successive one-month terms unless we receive written cancellation notice at least 30 days before the end of the final month of your Electronic Ads and electronic Services. You agree that the then current undiscounted rates and terms and conditions will apply to automatically renewed print directory Ads, Electronic Ads and electronic Services. We may cancel your Electronic Ads and electronic Services without notice at any time for any reason.

5. **Charges/Billing.** You agree to pay the monthly rates listed on this Agreement for the period we provide the Ads and Services, rounded up to the nearest month (and for subsequent terms, the then current undiscounted rates). You also agree to pay any one-time charges listed on this Agreement and any taxes due on your Ads or Services. We typically provide a print directory Ad for 12 months (the "Issue Period") for each directory issue, however, you agree that we may, at any time and without notice to you, increase or decrease the Issue Period of a print directory by up to six months. If an Issue Period is increased or decreased, charges for a print directory Ad will continue or stop accordingly. We may start billing before we publish or distribute Ads or begin providing Services, and monthly billing for Print Ads may continue after we distribute the next issue.

6. **Payment Terms.** You agree to pay all charges in full by the due date. You agree that you may not withhold any payment for any reason, including any dispute between you and us. We may require full or partial advance payment prior to providing any Ads or Services. You authorize us to review your credit history and to obtain your credit report, and you agree that we may report to credit reporting agencies your failure to make payments as required by this Agreement. We may apply payments from you, or monies owed to you, toward amounts owed under this Agreement or any other amounts you owe us. If you pay by credit card, we will bill the card automatically at the start of each billing period.

7. **Late Charges.** We will assess, and you agree to pay, late charges on account balances not paid by the due date (including balances accelerated under Section 8). Late charges will begin to accrue after the due date at a rate equal to the lesser of 18% per annum or the highest lawful rate. In addition, if you submit a check or draft that is dishonored for any reason, you agree to pay, in addition to the face amount of the check or draft, a service fee in an amount equal to the highest lawful amount.

8. **Our Remedies.** If you do not pay all charges by 30 days after the due date, fail to meet any other obligation under this Agreement or under any other agreement between us, or make any representation or warranty that is or becomes untrue, we may, without notice: (i) require you to pay immediately all unpaid amounts you owe and will owe for all Ads and Services for the entire term of this Agreement; (ii) remove your Ads from any Publication that has not published; (iii) remove, suspend, or modify your Electronic Ads; (iv) suspend or terminate any Services; (v) recover all collection costs and attorneys' fees; and (vi) pursue any other available legal or equitable remedies.

9. **Limitation of Liability/Disclaimers.** You agree to review the Ads and Services immediately after their publication or provision and to notify us in writing of any errors or omissions no later than 30 days after the error is first published or displayed or the Ad or Service omitted. You agree that we may provide free advertising pursuant to our then-current policies instead of a refund or credit to your account, and that we will have no liability with respect to any listings, Ads or Services provided to you at no cost. The total aggregate liability for us and our affiliates for errors in or omission of the Ads or Services, negligence, any breach of this Agreement, and any other cause of action or wrongful act is limited to, and shall in no event exceed, the lesser of (a) the amount by which the value of the Ad or Service was diminished or (b) the amount you have paid for the Ad or Service giving rise to the liability (the "Liability Cap"). We are not liable for consequential damages, punitive damages, incidental damages, or damages for harm to business, lost revenues, profits, or goodwill, or any other special damages, whether the claim is based on negligence, breach of contract or express or implied warranty, strict liability, misrepresentation, statute, tort, or any other theory of recovery, even if you or we knew such damages could or may result. We disclaim any obligations, representations, or warranties, whether express or implied, that are not expressly set forth in this Agreement including any warranty of merchantability or fitness for a particular purpose. Without limiting the generality of the foregoing, we do not warrant the number of responses to your Ads, the number of persons who will view your Ads, or any other business benefit. The limitations in this Section shall apply notwithstanding any failure of essential purpose under this Agreement. We are not liable to you for any deviation from or change in our policies, practices, and procedures, including without limitation those regarding the placement, position, or location of Ads, headings, or categories. You may increase the Liability Cap with regard to paid Ads and Services by agreeing to pay additional charges that will be determined by mutual agreement between you and us. You may obtain information about this option by contacting us at (800) 555-4833.

10. **Waiver of Class Action and Jury Trial and Consent to Binding Arbitration.** In any legal proceeding relating to this Agreement, the parties agree to waive any right they may have to participate in any

Received Time Dec. 23. 2010 10:42AM No. 3990

class, group, or representative proceeding and to waive any right they may have to a trial by jury. Any claim, controversy, or dispute that arises under or relates to this Agreement (other than claims to collect amounts you owe us or claims by you alleging breach of this Agreement to recover amounts you have paid us), including any dispute regarding any listing, Ad or Service, any omissions, incorrect phone numbers or other errors, and any Ad placement concerns, shall be referred by the aggrieved party to binding arbitration under the Commercial Rules of the American Arbitration Association.

11. Products/Publication/Distribution. We reserve the sole right to determine (and may change at any time without notice to you) the design, content, size, geographic coverage, distribution, and appearance of, and the types of advertising offered in, our Publications, our Electronic Platform, and Services and how, where, how many, when, and whether they are published, distributed, reissued, or displayed. We may reject all or any portion of Ads or Services at any time and for any reason (even If previously approved). If rejected, we will, as our sole obligation, refund any advance payments for that Ad or Service. If we receive allegations of copyright or trademark infringement, we may remove the disputed content immediately. We may change each name, street address, Internet address, and telephone number or any other content to conform to our standards, practices and policies or the policies of any third party on whose site, platform or network any Ad is published. We may publish the Ads of any other advertiser at any time and at any location in our Publications and in our Electronic Platform.

12. Proofs. We do not guarantee that we will provide you with proofs of your Ads. If we do provide proofs in time for modifications, you must notify us in writing of any changes/errors before the deadline we set. Otherwise, we will publish the Ad or perform the Service as shown and no adjustment will be made. Colors, contrast, photos, font, graphics, and other features may appear differently in the published product and no adjustments will be made for those differences.

13. Ad Placement. Except for Ads we designate as limited inventory advertising, we do not guarantee the placement or position of any Ad (or the Ad of any other advertiser) on or within any Publication, the Electronic Platform or any page, cover, or heading and will not provide any adjustments on claims relating to placement for any Ad.

14. Client Content; SuperGuarantee. "Client Content" means content you, or any person(s) using your password, supplies to us, posts, or asks us to use in your Ads. You grant us a perpetual, royalty-free, sub-licensable, non-exclusive right and license to use, copy, record, modify, display, publish, publicly perform, distribute (in any form or media), transmit by any means, and create derivative works from the Client Content in, and for the marketing and sale of, our products and services. You specifically grant us the right and license to insert the SuperGuarantee® shield design into your eligible Ads and to remove it from ineligible Ads. You are solely responsible for the Client Content and will produce and deliver all Client Content in accordance with our then current guidelines, procedures, technical requirements, and deadlines. If you fail to comply, we may cancel or suspend your Ads or Services.

15. Our Rights in Advertising Content/Copyright/Trademarks. If we create or supply any content for your Ads or design your Ads, the content and the Ads we create are our sole and exclusive property, except for Client Content and content we license from a third party. We may supply such content to other Clients. You agree that you have no right to use that content or the advertising developed with that content in other advertising or materials or in any other way, or to permit others to use the advertising or content. You agree that we own the copyright in, and all copyrighted portions of, each Publication and the Electronic Platform. You agree not to use or alter any trademark, trade name, trade dress or any name, picture or logo that is commonly identified with us or our affiliates, including, without limitation, the trademarks SuperGuarantee® and SuperGuarantee shield design, unless permission is granted by us in writing.

16. Client's Representations. You represent and warrant that: (i) you have the unrestricted right to use, and to grant the licenses you grant in this Agreement with respect to, all Client Content and that your licensing of Client Content to us will not infringe any third party copyright or trademark rights; (ii) your Ads comply with all applicable laws, orders, codes, regulations and requirements, and you and any individuals listed in your Ads have all required licenses to provide the goods and services advertised in all jurisdictions where the Ads appear; (iii) you have not made any false or misleading claims in any Ad; (iv) you have not requested, and will not use, the Ads or Services, or our Electronic Platform for any unlawful purpose or business; (v) you have not violated any contractual or legal obligation by signing this Agreement and requesting us to publish any Ad; and (vi) you are or represent the business related to the Ads and Services listed above. You will notify us immediately if any of the above becomes inaccurate.

17. Limited Inventory Items. If your Ad published in our print directory is designated as a limited inventory item that is offered in the next issue of the same directory, you will have right of first refusal for that same item of advertising in the next issue of the same directory if you: (i) sign a new Agreement to renew the Ad at the then current rate prior to the renewal due date we specify; and (ii) have paid all amounts due under this Agreement as of that renewal date. If you do not meet these requirements or if you cancel the limited inventory item, we may immediately offer the advertising item to other interested parties. You may not assign, sell or transfer the right of first refusal granted in this Section.

18. Indemnification. You agree to defend, indemnify and hold us and our affiliates harmless from any liability or costs, including attorneys' fees and expenses, resulting from: (a) any breach of your representations, warranties or covenants; (b) any act, omission or fault of you or your employees, agents or contractors in connection with the Ads or Services; (c) any claim that the Client Content or other Information provided by you violates any applicable law or infringes on any third party patent, copyright, trademark, trade secret or other intellectual property or proprietary right; (d) any communication through your Electronic Ads or your collection or use of any information obtained through your Ads, the Services or our Electronic Platform; (e) any breach of any applicable export control laws; and (f) any transactions initiated through your Electronic Ads and any payment processing services. You will continue to be obligated by this Section even after the termination of this Agreement.

19. Governing Law. You agree that this Agreement will be governed by and construed in accordance with, and all matters relating to or arising under this Agreement will be governed by, Texas law without reference to the laws relating to conflicts of laws.

20. Entire Agreement. This Agreement constitutes the entire agreement between you and us and supersedes all prior agreements and representations, whether express or implied, written or oral, with respect to the Ads and Services. You agree not to include any limiting endorsement on a check or other form of payment, and we may cash a check containing a limiting endorsement or accompanied by any limiting instruction without affecting your obligations or our rights. Neither you nor any SuperMedia employee or agent is authorized to change or add to this Agreement or any other documents that are part of this Agreement in any way, and any purported change or addition, whether oral or written, is void.

21. Miscellaneous. This Agreement is binding on and for the benefit of you and your successors. We may assign this Agreement, but you may not assign any of your rights or delegate any of your duties under this Agreement without our prior written consent. Except as otherwise set forth in this Agreement, neither you nor we will lose any of our rights under this Agreement, even if you or we do not enforce a right or delay in enforcing a right. Neither party will be liable for any damages arising from acts of God or events outside of that party's reasonable control. If any provision of this Agreement is found to be unenforceable, the rest of this Agreement will remain in full force and effect. Our imaged copy of this Agreement will be deemed a duplicate original for evidentiary purposes.

22. Contact by Us. You agree that we may contact you regarding your Ads or Services, or offers to provide Ads or Services, whether by live telephone, recorded message, U.S. mail or other mail, facsimile or e-mail. You agree that telephone conversations between you and us or our agents may be monitored and/or recorded (including Recorded Oral Agreements).