IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALWAYS IN SERVICE, INC., | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | NO. 11-127 |
| v. | : | |
| | : | |
| SUPERMEDIA SERVICES - EAST, | : | |
| INC., f/k/a Idearc Media Services – East, | : | |
| Inc., et al., | : | |
| | : | |
| Defendants. | : | |

**OPINION**

**Slomsky, J.**                                                        **March 5, 2012**

## I.  INTRODUCTION

Before the Court is Defendants' Motion to Dismiss Plaintiff's Amended Complaint Pursuant to Federal Rule of Civil Procedure 12(B)(6).  (Doc. No. 15.)  Plaintiff's claims arise out of an advertising relationship with Defendants, during which Plaintiff spent considerable sums of money for telephone book advertising and internet marketing services.  (Doc. No. 13.)  The commercial relationship lasted for over two years.  (Id. ¶ 21.)

On June 23, 2011, Plaintiff filed an Amended Complaint against Defendants.  (Doc. No. 13.)  Plaintiff asserts two claims against Defendants:  Count I alleges a breach of contract claim and Count II alleges claims of fraudulent inducement, deceit and misrepresentation.  (Id. ¶¶ 51-69.)  On July 13, 2011, Defendants filed the instant Motion to Dismiss Plaintiff's Amended Complaint Pursuant to Federal Rule of Civil Procedure 12(B)(6).  (Doc. No. 15.)  On September 28, 2011, a hearing was held on Defendants' Motion to Dismiss.  (Doc. Nos. 11 and 12.)

-1-

Following the hearing, the parties submitted supplemental briefing.  (Doc. Nos. 22-24.)  For reasons discussed below, the Court will deny Defendants' Motion to Dismiss Plaintiff's Amended Complaint.[1]

## II.   FACTUAL BACKGROUND

Plaintiff, Always in Service, Inc. ("AIS"), formerly known as Al Best Locksmith, is a business formed by three individuals in 2007, specializing in locksmith and other home improvement services.  (Doc. No. 13 ¶ 7.)  Defendants SuperMedia Services – East, Inc., f/k/a Idearc Media Services – East, Inc., SuperMedia LLC, t/a SuperMedia, f/k/a Idearc Media LLC, and SuperMedia Inc., f/k/a/ Idearc Inc. (collectively "Defendants"), are an advertising conglomerate whose publications include the Verizon Yellow Pages.  (Doc. No. 13 ¶¶ 2-4; Doc. No. 15 ¶ 1.)  Defendants also provide internet marketing services.  (Doc. No. 13 ¶ 26.)  Plaintiff AIS alleges that, from the middle of 2007 through October 2010, it paid for advertising with Defendants.  (Id. ¶ 23.)

Plaintiff AIS initially advertised in Defendants' telephone books.  Thereafter, it began advertising through Defendants' internet marketing services, referred to as "pay-per click" services.  (Id. ¶¶ 12, 26.)  At some point Plaintiff cancelled the "pay-per click" services.  Plaintiff

---

[1]     The Court has considered the following documents in deciding Defendants' Motion to Dismiss Plaintiff's Amended Complaint Pursuant to Federal Rule of Civil Procedure 12(B)(6):  Defendants' Motion to Dismiss Plaintiff's Amended Complaint Pursuant to Federal Rule of Civil Procedure 12(B)(6) (Doc. No. 15), Plaintiff's Opposition to Defendants' Motion to Dismiss (Doc. No. 16), the Reply Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiff's Amended Complaint Pursuant to Federal Rule of Civil Procedure 12(B)(6) (Doc. No. 17), Plaintiff's Supplemental Memorandum of Law in Opposition to Defendants' Motion to Dismiss (Doc. No. 22), Defendants' Reply to Plaintiff's Supplemental Memorandum of Law in Opposition to the Motion to Dismiss the Amended Complaint (Doc. No. 23), and Plaintiff's Reply to Defendants' Reply to Plaintiff's Supplemental Memorandum of Law in Opposition to the Motion to Dismiss the Amended Complaint (Doc. No. 24).

alleges that to continue advertising with Defendants in their telephone books, it was required to pay a $2,000 per month management fee.  (Id. ¶ 30.)  On October 14, 2010, the Pennsylvania Attorney General filed a complaint against Plaintiff AIS and its individual officers, alleging violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law.[2]  (Id. ¶ 43.)  Thereafter, Plaintiff AIS commenced the instant civil litigation.[3]  (Doc. No. 1.)

Plaintiff's breach of contract claim is predicated on numerous oral contracts that it contends were created every time Defendants offered, and Plaintiff accepted, changes in the advertising program.  Plaintiff alleges that the parties agreed to more than 2,000 verbal contracts for advertising services, internet marketing services and management fees.[4]  (Doc. No. 13 ¶¶ 12,

---

[2]      A copy of the Attorney General's complaint was attached to Defendants' first Motion to Dismiss and is referenced by Plaintiff in the Amended Complaint.  (Doc. No. 6, Ex. B; Doc. No. 13 ¶ 43.)  The Commonwealth alleged that AIS's print advertisements created false and misleading impressions regarding, among other things, the number and physical location of its business, its association and/or membership with the Better Business Bureau, its services and qualifications.  (Doc. No. 6, Ex. B; Doc. No. 15 at 10 n.6.)  In addition, the Commonwealth claimed that AIS failed to provide to customers accurate estimates of work to be performed, did so in a shoddy and unworkmanlike manner, and failed to comply with the three (3) day right to cancel provisions of the Consumer Protection Law and the Home Improvement Consumer Protection Act.  (Doc. No. 6, Ex. B ¶ 14; Doc. No. 15 at 10 n.6.)  Plaintiff AIS alleges in the Amended Complaint that the practices as alleged by the Commonwealth were the fault of Defendants.  (Doc. No. 13 ¶ 43.)  The Attorney General did not file a claim against the SuperMedia Defendants.  (Doc. No. 15 ¶ 6.)  The case against AIS was settled in November 2011.  (See Commonwealth v. Always in Service, Inc., et al., October Term, 2010, Case ID: 101001656.)

[3]      Plaintiff's original complaint was filed on January 7, 2011.  (Doc. No. 1.)  On March 11, 2011, Defendants filed a motion to dismiss the original complaint, and a hearing was held on May 23, 2011.  (Doc. Nos. 6 and 12.)  Thereafter, Plaintiff filed an Amended Complaint.  (Doc. No. 13.)

[4]      Plaintiff contends that advertising contracts involved, among other things, at least one, and sometimes as many as four, of Defendants' telephone books from the middle of 2007 until October 2010.  (Doc. No. 13 ¶ 25; Doc. No. 22 at 3.)  Changes in advertising could have occurred every two weeks.  (Doc. No. 13 ¶ 25; Doc. No. 22 at 3.)  Plaintiff avers that "simple

21, 25, 26, 30, 31; Doc. No. 22 at 2-5.)  According to Plaintiff's Amended Complaint, the terms

of these oral contracts were established almost exclusively by verbal representations between the

parties, but were occasionally documented by artwork, proofs, renewal pricing and discount

package spreadsheets, and advertisements in the phone books, as well as emails and notes.  (Doc.

No. 13 ¶ 54.)  Plaintiff initially attached an Advertising Agreement to its original complaint as

"representative of the various agreements entered into between the parties."  (Doc. No. 1 ¶ 41.)

The Advertising Agreement is an unsigned, undated two page document containing general

"Terms and Conditions."  (Doc. No. 1, Ex. A.)  The "Terms and Conditions" include the

following provisions:[5]

> 1.  Order.  By signing below or by Recorded Oral Agreement (herein so
> called), you authorize us to publish the Ads listed in this Agreement in the
> applicable Publications and/or Electronic Platform, and to provide the
> Services listed in this Agreement.
>
> *       *       *
>
> 19.  Governing Law.  You agree that this Agreement will be governed by
> and construed in accordance with, and all matters relating to or arising
> under this Agreement will be governed by, Texas law without reference to
> the laws relating to conflicts of laws.

(Id.)  Neither this Advertising Agreement nor any other document, however, are attached to the

Amended Complaint.  (Doc. No. 13; Doc. No. 15 ¶ 10.)  No evidence of any "Recorded Oral

Agreement" as required by the Advertising Agreement is referred to in the Amended Complaint.

(Doc. No. 13.)

---

math demonstrates that more than 2,000 verbal contracts were agreed upon between the parties
during the time in question."  (Doc. No. 22 at 3.)

[5]        According to the Advertising Agreement, "'You' means the individual or business
entity listed above.  'We,' 'us' and 'our' means SuperMedia LLC . . . ."  (Doc. No. 1, Ex. A.)

According to this Complaint, Plaintiff AIS first met with representatives of Defendants, Joseph Albert and his then supervisor, Victoria Jackson, in the middle of 2007.  (Doc. No. 13 ¶ 12.)  The parties then entered into a verbal agreement for Plaintiff to purchase advertising in Defendants' telephone books that were published in Montgomery County, Pennsylvania.  (Id.)  The initial advertisement contained color imaging over two pages of the telephone book, referred to by Plaintiff as a "double truck" advertisement.  (Id. ¶ 13.)  Plaintiff avers that the "double truck" advertisements cost nearly $500 per month and that Plaintiff AIS was required to pay substantial costs up front.  (Id. ¶¶ 14-15.)  During the parties advertising relationship, Plaintiff purchased over time telephone book advertisements from Defendants to be published in hundreds of communities throughout Pennsylvania and five other states.  (Id. ¶ 20.)  During this time, Joseph Albert stopped working for SuperMedia and representative Keith Cohen, in conjunction with manager Geoff Fitzgibbons, began to sell advertising to Plaintiff.  (Id. ¶ 21.)

The verbal terms agreed upon by the parties regarding telephone book advertising include:  Plaintiff AIS's obligation to purchase print advertisements in exchange for their publication by Defendants (Doc. No. 13 ¶ 20); a promise by Defendants to place Plaintiff AIS's advertisements in a prominent position within the telephone books (id. ¶ 34); Defendants' promise to provide a certain number of telephone books in each geographic area (id. ¶ 50(d)); and Defendants' agreement to provide AIS with free direct mailing advertisements (id. ¶ 50(h)).

At an unspecified time during this relationship, Defendants informed Plaintiff AIS that they would not continue telephone book advertising unless Plaintiff also purchased internet marketing services, referred to as "pay-per click" advertising.  (Id. ¶ 26.)  The cost of the "pay-per click" services was approximately $15,000 per month.  (Id.)  The verbal terms of the "pay-per

click" agreements include:  assurances by Defendants that "pay-per click" advertising would yield a definite amount of internet customers, Defendants' agreement to tailor the "pay-per click" marketing services to achieve the most relevant results in terms of customer geography and subject matter, and a promise that Plaintiff would be able to review the IP addresses of their "pay-per clicks."  (Id. ¶¶ 28-29, 32.)

Finally, Plaintiff alleges that after it cancelled the "pay-per click" service, it was required to pay Defendants a $2,000 monthly management fee in order to continue its telephone book advertising.  (Id. ¶ 30.)  All representations concerning "pay-per click" services and management fees were verbal.  (Id. ¶ 31.)

Plaintiff's fraudulent inducement, deceit and misrepresentation claims arise from alleged representations made by agents of Defendants regarding the cost, quality and availability of telephone book advertisements.  (Id. ¶¶ 61-62.)  In addition, Defendants provided assurances that the "pay-per click" services would achieve certain results and then proceeded to deceive Plaintiff as to the amount of "clicks" it received by using improper keywords and inappropriate geographic regions.  (Id. ¶¶ 28-29.)  The Amended Complaint describes the various techniques used by defendants that constitute the alleged fraud.  For example, Plaintiff contends that Defendants permitted other companies to engage in "heading jumping," which allows other businesses to jump headings, i.e. place an advertisement under "Lockers," which alphabetically comes before "Locks," in order to gain a more prominent position in the telephone books.  (Id. ¶¶ 33-34.)  This practice allegedly deprived Plaintiff of the prominent position in telephone books that it paid for, causing Plaintiff to have significantly less customer volume than assured by Defendants.  (Id. ¶ 34.)

Plaintiff contends that Defendants had no intention of fulfilling their verbal promises and representations.  (Id. ¶ 61.)  Instead, Defendants induced Plaintiff AIS to purchase telephone book advertisements and to become dependent on those advertisements as part of a highly calculated scheme to coerce Plaintiff into purchasing additional services.  (Id. ¶¶ 61-64.)  For example, Defendants' allegedly told Plaintiff that Defendants would not continue the telephone book advertisements *unless* Plaintiff purchased additional "pay-per click" internet marketing services.  (Id. ¶¶ 26-27.)  Moreover, after Plaintiff cancelled the "pay-per click" services, Defendants required a $2,000 per month "management fee" in order for Plaintiff to continue advertising in Defendants' telephone books.  (Id. ¶ 30.)  Accordingly, Plaintiff claims that it relied on Defendants' false representations in entering into the oral contracts.  (Id. ¶¶ 66-67.)

Defendants move to dismiss the Amended Complaint under Federal Rule of Civil Procedure Rule 12(b)(6) for three reasons:  (1) Plaintiffs claims are precluded by the Terms and Conditions of the parties' Advertising Agreement; (2) Plaintiff has failed to adequately plead a breach of contract claim; and (3) the fraud claim is barred by the gist of the action doctrine. (Doc. No. 15.)

## III.    LEGAL STANDARD

The motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) is set forth in the Supreme Court's Opinion in Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009).  After Iqbal it is clear that "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice" to defeat a Rule 12(b)(6) motion to dismiss.  Id. at 1949; see also Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007).  Applying the principles of Iqbal and Twombly, the Third Circuit in Santiago v. Warminster Twp., 629 F.3d 121 (3d Cir. 2010),

set forth a three-part analysis that district courts in this Circuit must conduct in evaluating

whether allegations in a complaint survive a 12(b)(6) motion to dismiss.  629 F.3d at 130; see

also Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009) (applying the principles of

Iqbal and articulating a two-part test).

> First, the court must "tak[e] note of the elements a plaintiff must
> plead to state a claim."  Second, the court should identify allegations
> that, "because they are no more than conclusions, are not entitled to
> the assumption of truth."  Finally, "where there are well-pleaded
> factual allegations, a court should assume their veracity and then
> determine whether they plausibly give rise to an entitlement for
> relief."

Santiago, 629 F.3d at 130 (quoting Iqbal, 129 S. Ct. At 1947, 1950).  While a district court must

accept all of the complaint's well-pleaded facts as true, a complaint must do more than allege a

plaintiff's entitlement to relief – it must "show" such an entitlement with its facts.  Fowler, 578

F.3d at 210-11 (citing Phillips v. Cnty. of Allegheny, 515 F.2d 224, 234-35 (3d Cir. 2008)).

## IV.   DISCUSSION

In deciding a motion to dismiss, the court may properly consider the complaint, exhibits

attached thereto, documents referenced therein, matters of public record, and undisputably

authentic documents if the complainant's claims are based upon these documents.  Mayer v.

Belichick, 605 F.3d 223, 230 (3d Cir. 2010); Kernaghan v. BCI Commc'ns, Inc., 802 F. Supp. 2d

590, 593 n.2 (E.D. Pa. 2011).  Reading the Amended Complaint in the light most favorable to

Plaintiff, the Court cannot conclude that the Advertising Agreement attached to the original

complaint constitutes *the* contract or contracts which governs the relationship between the

parties.

The Advertising Agreement was never executed through signing or by "Recorded Oral

Agreement." Plaintiff's claims are based on *oral* contracts. Plaintiff refers to the Advertising Agreement in the Amended Complaint as merely being "representative" of various agreements entered into between the parties. (Doc. No. 13 ¶ 53; Doc. No. 16 at 12-14.) At this stage of the proceedings, viewing the factual allegations in the light most favorable to Plaintiff, the allegation that oral contracts were entered into governs. Moreover, Plaintiff maintains here that Pennsylvania law applies. (Doc. No. 16 at 14-17.) Whether Texas law, which is noted in the Advertising Agreement, or Pennsylvania law applies will be decided after discovery is complete. As such, at this stage of the litigation, the Court cannot consider the Advertising Agreement as the definitive contract between the parties.

As to the breach of contract claim, Defendants argue that Plaintiff has failed to sufficiently plead the elements of a breach of contract claim under either Pennsylvania or Texas law. (Doc. No. 15 at 15-18.) Defendants contend that Plaintiff's allegations lack specificity regarding, among other things, the dates and terms of the purported contracts and the existence of consideration. (Doc. No. 15 at 16-17; Doc. No. 17 at 2-3; Doc. No. 23 at 7-8.) In response, Plaintiff maintains that its breach of contract claim is based on more than 2,000 *oral* agreements between the parties. (Doc. No. 16 at 12-14; Doc. No. 22 at 2-3.) Plaintiff contends that it has provided adequate facts regarding the alleged oral agreements, their terms, and Defendants' breach thereof to survive a motion to dismiss. (Doc. No. 16 at 12.)

In order to establish a breach of contract claim under Pennsylvania law, a plaintiff must show: (1) the existence of a contract; (2) a breach of a duty imposed by the contract; and (3) damages. Sullivan v. Chartwell Inv. Partners, LP, 873 A.2d 710, 716 (Pa. Super. Ct. 2005). "While every element must be pled specifically, it is axiomatic that a contract may be manifest

orally, in writing, or as an inference from the acts and conduct of the parties." Id. (citing J.F. Walker Co., Inc. v. Excalibur Oil Grp., Inc., 792 A.2d 1269, 1272 (Pa. Super. Ct. 2002)).  Under Texas law, to recover for a breach of contract a plaintiff must show:  (1) a valid contract; (2) performance; (3) breach; and (4) resulting damages.  Southwest Electronics Indus., Inc. v. Fair Rite Prods. Corp., No. 05-171, 2008 WL 2358226, at *2 (Tex. App. June 11, 2008).  Under both Texas and Pennsylvania law, Plaintiff has sufficiently established a breach of contract claim at the motion to dismiss stage.

Plaintiff has identified three "categories" of oral contracts in this case:  (1) contracts to purchase advertising in Defendants' telephone books; (2) contracts to purchase "pay-per click" internet marketing services; and (3) contracts relating to management fees.  (Doc. No. 13 ¶¶ 12, 26, 30, 31; Doc. No. 22 at 2-7.)  Plaintiff estimates that more than 2,000 verbal contracts were agreed upon during the relevant time period.  (Doc. No. 13 ¶¶ 21, 25; Doc. No. 22 at 3.)  Plaintiff first met with Joseph Albert and his supervisor, Victoria Jackson, and verbally agreed to purchase advertising in Defendants' telephone books.  (Doc. No. 13 ¶ 12.)  Defendants agreed to numerous verbal terms, including promises to:  place Plaintiff's ads in prominent positions in Defendants' telephone books (id. ¶ 34); provide a certain number of telephone books in each geographic area (id. ¶ 50(d)); and provide free direct mailing advertisements (id. ¶ 50(h)).  Plaintiff initially paid approximately $500 per month for telephone book advertising and alleges that, at the height of the advertising program with Defendants, it was paying over $50,000 per month for advertisements in telephone books distributed in Pennsylvania and five other states.  (Id. ¶¶ 13, 20, 23.)  Finally, Defendants' alleged breaches included:  printing advertisements without approval, failing to honor pricing agreements after receiving payments up front from

Plaintiff, delivering fewer books in certain geographic areas and/or delivering telephone books late to customers, and failing to provide free direct mailing advertisements.  (Id. ¶ 50.)

As to internet marketing services, Defendants allegedly promised that Plaintiff's "pay-per click" services would be tailored by subject matter and geographic location suitable to Plaintiff's services, that "pay-per click" services would yield a definite number of internet customers, and that Plaintiff would be able to review the IP addresses of their "pay-per clicks."  (Id. ¶¶ 28-29, 32.)  As consideration, Plaintiff paid $15,000 monthly for these internet services.  (Id. ¶ 26.) Defendants allegedly breached these terms by failing to provide Plaintiff with the IP addresses of their "pay-per clicks," as well as failing to yield the promised number of customers.  (Id. ¶¶ 28-29, 32.)  Finally, Plaintiff contends that after it terminated internet advertising, it was required to pay $2,000 monthly in management fees in order to continue telephone book advertising.  (Id. ¶ 30.)  However, this averment contains the only information provided as to the management fee contracts.

Although Plaintiff has not provided in the Amended Complaint specific details of the alleged 2,000-plus oral agreements at issue here, such as the exact number of contracts, the exact date of each one, or the specific terms apart from the fact that it paid for advertisements and they were placed by Defendants in their advertising media, at the motion to dismiss stage, the failure to provide more specific information does not warrant dismissal.  Sufficient information is alleged to plausibly show that the contracts existed.  During discovery, Plaintiff will have the opportunity to obtain information in order to supplement the factual record and to identify each

contract it claims was breached.[6]

At this point in the litigation, Plaintiff has in fact provided Defendants and the Court with considerable information regarding the alleged oral contracts.  Plaintiff has provided the names of at least four of Defendants' representatives who allegedly entered into the verbal agreements with Plaintiff during the relevant time period.  (Doc. No. 13 ¶¶ 12, 21.)  In addition, Plaintiff alleges a number of contractual terms as referenced above, and avers that considerable sums of money were paid in consideration of Defendants' promises.  (Id. ¶¶ 12, 13, 23, 34, 50.)  Finally, Defendants breached these terms by:  printing advertisements without approval; reneging on pricing after receiving down payments from Plaintiff; delivering fewer books to certain geographical areas; delivering telephone books late to customers; and failing to give Plaintiff free direct mail advertising.  (Id. ¶ 50.)  Reading the Amended Complaint in the light most favorable to Plaintiff, the Court concludes that Plaintiff has adequately shown the plausible existence of a breach of contract claim at the motion to dismiss stage.

In addition, Defendants seek dismissal of Plaintiffs fraud claim under the gist of the action doctrine.[7]  (Doc. No. 15 at 19-21.)  Under the gist of the action doctrine, a plaintiff is precluded from recovering in tort for claims that actually sound in contract.  Jones v. ABN Amro Mortg. Grp., Inc., 606 F.3d 119, 123 (3d Cir. 2010).  "When a plaintiff alleges that the defendant committed a tort in the course of carrying out a contractual agreement, Pennsylvania courts

---

[6]       Following the completion of discovery, Plaintiff will be required to specify the date, terms, and consideration that applies to each contract.

[7]       Unlike the breach of contract claim where Defendants are asserting that Texas law applies, Defendants in their Memorandum of Law in Support of the Motion to Dismiss cite to Pennsylvania law in discussing the gist of the action doctrine.  (Doc. No. 15 at 19-21.) Therefore, the Court will apply Pennsylvania law in its analysis of the fraud claim.

examine the claim and determine whether the 'gist' or gravamen of it sounds in contract or tort."
The Knit With v. Knitting Fever Inc., et al., Nos. 08-4221, 08-4775, 2009 WL 3427054, at *5
(E.D. Pa. Oct. 20, 2009) (citing Sunquest Info. Sys., Inc. v. Dean Witter Reynolds, Inc., 40 F.
Supp. 2d 644, 651 (W.D. Pa. 1999)).  In making this determination, the court must ascertain the
source of the duties allegedly breached.  The Knit With, 2009 WL 3427054, at *5; see Weber
Display & Packaging v. Providence Washington Ins. Co., No. 02-7792, 2003 WL 329141, at *3
(E.D. Pa. Feb. 10, 2003) ("The difference between tort and contract actions is noted by the fact
that tort actions arise where a party breaches a duty imposed as a matter of social policy; whereas
contract actions arise where a party breaches a duty imposed by mutual consensus between the
parties").  "[I]f the duties in question are intertwined with contractual obligations, the claim
sounds in contract, but if the duties are collateral to the contract, the claim sounds in tort."  The
Knit With, 2009 WL 3427054, at *5.

    Defendants argue that Plaintiff's fraud claim is actually a breach of contract claim
because the gravamen of the claim is that Defendants failed to provide agreed upon services.
(Doc. No. 15 at 21.)  On the other hand, Plaintiff argues that its tort claim is predicated not on
Defendant's fraudulent performance of the alleged contracts, but on their fraudulent inducement
of the contracts.  (Doc. No. 16 at 14-16.)  As such, Plaintiff contends that the gist of the action
doctrine does not bar its claim.

    Courts within the Eastern District of Pennsylvania, applying Pennsylvania law, have
consistently held that the gist of the action doctrine can apply to fraud cases.  However, as the
Pennsylvania Superior Court recognized in Etoll, Inc. v. Elias/Savion Adver., Inc., 811 A.2d 10
(Pa. Super. Ct. 2002), these cases appear to apply the doctrine where the claims are for fraud in

the *performance* of the contract, but not where claims are for fraud in the *inducement* of the

contract.  Etoll, Inc., 811 A.2d at 19; see e.g., Foster v. Northwestern Mutual Life, 02-2211, 2002

WL 31991114, at *3 (E.D. Pa. July 25, 2002) (suggesting that fraud in the inducement of a

contract would not necessarily be covered by gist of the action doctrine); Galdieri v. Monsanto

Co., 245 F. Supp. 2d 636, 650-51 (E.D. Pa. 2002) (finding that gist of the action doctrine barred

fraud claims that were "intertwined" with breach of contract claims); Polymer Dynamics, Inc. v.

Bayer Corp., No. 99-4040, 2000 WL 1146622, at *6-7 (E.D. Pa. Aug. 14, 2000) (denying motion

to dismiss fraud claims that may relate to "promises of future business not contemplated by the

sales contracts," as well as proprietary information not covered by parties' disclosure agreement).

"Fraud in the inducement of a contract would not necessarily be covered by [the gist of the action

doctrine] because fraud to induce a person to enter into a contract is generally collateral to (*i.e.*,

not 'interwoven' with) the terms of the contract itself."  Etoll, Inc., 811 A.2d at 17; see also

Sullivan v. Chartwell Inv. Partners, LP, 873 A.2d 710, 719 (Pa. Super. Ct. 2005) (concluding that

because tort claims related to inducement to contract, they were collateral to contract

performance and not barred by gist of the action doctrine).

      Here, Plaintiff's fraud claim relies on its allegation that Defendants made false promises

and misrepresentations to Plaintiff with the intention of inducing Plaintiff to enter into the initial

advertising agreements and rendering Plaintiff dependant on Defendants' services.  (Doc. No. 13

¶¶ 25-41, 61-62.)  As a result of Defendants' inducement, Plaintiff alleges it entered into

approximately 2,000 oral contracts for print and internet services that Defendants "never

intended to provide."  (Id. ¶¶ 25-47, 61-62.)  Plaintiff maintains that without the alleged

misrepresentations, it would not have entered into an advertising relationship with Defendants.

(Id. ¶¶ 61-67.)  These allegations, when considered in the context of the Amended Complaint as a whole, plausibly allege a fraudulent inducement claim.

Furthermore, courts are hesitant to decide whether the gist of an action is in contract or tort at the motion to dismiss stage of a proceeding, without the benefit of a more developed factual record.  Weber Display & Packaging, 2003 WL 329141, at *4; see The Knit With, 2009 WL 3427054, at *7 (noting that "courts in this district have shown some reluctance to dismiss claims for fraud in the inducement or negligent misrepresentation early in the litigation").  "Often times, without further evidence presented during discovery, the court cannot determine whether the gist of the claim is in contract or tort."  Weber Display & Packaging, 2003 WL 329141, at *4. Because Plaintiff has alleged sufficient facts to constitute fraudulent inducement and because it is premature to decide whether a claim arises in contract or tort early in litigation, Defendants' Motion to Dismiss the fraud claim will be denied.[8]

## V.      CONCLUSION

For the foregoing reasons, the Court will deny in its entirety Defendants' Motion to Dismiss Plaintiff's Amended Complaint Pursuant to Federal Rule of Civil Procedure 12(B)(6). An appropriate Order follows.

---

[8]       Defendants also argue that Plaintiff's fraud claim is barred by the terms of the Advertising Agreement.  (Doc. No. 15 at 21-22.)  However, as discussed above, at this stage of the proceeding the Court will not consider the Advertising Agreement as the definitive contract between the parties.